# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 24-6641

ROBERT O. EDWARDS, JR., APPELLANT,

V.

DOUGLAS A. COLLINS,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 15, 2026                    Decided August 4, 2026)

*Stephanie M. Leacock*, with whom Glenn R. Bergmann was on the brief, both of Rockville, Maryland, for the appellant.

*Jonathan G. Scruggs* with whom *Danielle A. Runyan*, Acting General Counsel; *David L. Quinn*, Assistant Chief Counsel; *Mark D. Vichich*, Deputy Chief Counsel, *Emily K. Cincinnati*, and *Jack A. Jorgest* were on the brief, all of Washington, D.C., for the appellee.

Before ALLEN, *Chief Judge*, and FALVEY and JAQUITH, *Judges*.

FALVEY, *Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed a concurring opinion.

FALVEY, *Judge*: Scientific reports created under the mandate of the Agent Orange Act of 1991 remain an important source of evidence in the veterans benefits adjudication system. This case presents the issue of whether these reports could be constructively of record given varied statutory and regulatory changes in the modernized VA appeals structure. The Court must also decide whether the agency of original jurisdiction (AOJ) or the Board of Veterans' Appeals can consider independent evidence submitted through past Board decisions that are unrelated to the given appeal.

Our answer to both questions is yes. Nothing prohibits the possibility that the Agency was in constructive possession of a report while the AOJ was receiving evidence. And information from an independent and relevant source is not diluted because it happens to be communicated through another veteran's Board decision. With this established, we find that not all the pertinent evidence was considered in the present appeal. Further discussion by the Board is consequently necessary, so we will remand the matter for additional adjudication.

# I. RESPECTED REPORTS

Retellings of the Agent Orange Act and its residuum are plentiful. *Euzebio v. McDonough*, 989 F.3d 1305, 1310-15 (Fed. Cir. 2021); *LeFevre v. Secretary of Veterans Affairs*, 66 F.3d 1191, 1193-96 (Fed. Cir. 1995); *Aviles-Rivera v. McDonough*, 35 Vet.App. 268, 271-72 (2022). But it is a narrative worth repeating before reciting the facts and evidentiary concerns that brought us here.

This thread commences with the Veterans' Dioxin and Radiation Exposure Compensation Standards Act, which required VA to resolve Agent Orange claims for benefits based on "exposure during service" in Vietnam. Pub. L. No. 98-542 at § 5(a)(1)(A), 98 Stat. 2725 (1984). To meet this requirement, the Act explained that a panel of agency experts called the Dioxin Council would communicate to the Agency various scientific findings regarding possible health risks attributed to herbicide exposure. *Id*. at § 5(b)(1)(A)-(B). Based on the Council's evaluation of the evidence, VA would then promulgate regulations providing presumptive service connection for disabilities with a high statistical connection to exposure. *Id*. at § 5(b)(2).

The Dioxin Act's tenure was ultimately fleeting. Over its lifespan, the Council found that just one disease, chloracne, had a "cause-and-effect relationship" with herbicide exposure such that VA found service connection presumptively appropriate. *See* 50 Fed. Reg. 34,458 (Aug. 26, 1985); *Nehmer v. U.S. Veterans' Admin.*, 712 F. Supp. 1404, 1408 (N.D. Cal. 1989). And, following a class action lawsuit, the Agency's cause-and-effect test was jettisoned for an inquiry into whether "a significant statistical association" existed between a given disease and exposure. *Nehmer*, 712 F. Supp. at 1409; *see* 54 Fed. Reg. 40,391 (Oct. 2, 1989).

Congress dissipated remaining concerns—and the Dioxin Council—through the Agent Orange Act. Rather than rely on a collateral cadre of VA experts to classify connections between conditions and exposure, the Act directed the Agency to outsource this responsibility to an unaligned organization: the National Academies of Sciences, Engineering & Medicine (NAS). Pub. L. No. 102-4, 105 Stat. 11, at § 3(a)-(b) (1991) (codified in part at 38 U.S.C. § 1116). Under this partnership, the NAS produces reports that routinely review and summarize scientific evidence before gauging the strength of any association between various disabilities and herbicide exposure. *Id*. at §§ 3(c), 3(g). The Secretary takes it from there and determines whether presumptive service connection is warranted for diseases discussed in the NAS reports. *Id*. at § 3; *see* 38 U.S.C. § 1116(b)-(c).

2

As the Federal Circuit once explained, "[t]he importance and relevance of the NAS reports to Agent Orange claims are well-known and well-established—they are the result of decades of veteran engagement." *Euzebio*, 989 F.3d at 1320. We have likewise emphasized the important role that NAS reports play in cases regarding Agent Orange exposure. *See, e.g., Davis v. McDonough*, 36 Vet.App. 142, 153 (2023).

Although the reports are famously used as a cornerstone of presumptive service-connection determinations, they might also be used as evidence in direct service-connection arguments where Agent Orange exposure is alleged. And their publication in the Federal Register apprises the Agency as to the findings published therein. *Euzebio*, 989 F.3d at 1314 (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.")). Those findings may then implicate the Secretary's duty to assist. *Id*. (citing 38 U.S.C. § 5103A(d)(2)(b) (requiring the Agency to provide an exam when evidence "indicates that the disability or symptoms may be associated" with service)).[1]

## II. A TALE OF TWO UPDATES

This case concerns two NAS reports—Updates 2010 and 2012—and the extent to which evidentiary restrictions prevent their consideration. The facts of this case begin as one might expect. Robert O. Edwards, a Navy veteran, was exposed to herbicides during his service in the Vietnam War. Record (R.) at 2603, 5211. He was later diagnosed with squamous cell carcinoma of the right tonsil.[2] R. at 2941. Mr. Edwards filed a claim for that condition in November 2019, alleging that the cancer was caused by his exposure to Agent Orange. R. at 2972. Because VA's regulations do not permit presumptive service connection for squamous cell carcinoma, *see* 38 C.F.R. § 3.309 (e) (2026), Mr. Edwards needed to prove direct service connection, *see Washington v. Nicholson*, 19 Vet.App. 362, 367 (2005) (listing the elements required to prove direct service connection).

---

[1] The NAS reports relay their conclusions about diseases and herbicide exposure in terms of an association between the two. And they generally place diseases into one of four categories: (1) sufficient evidence of an association; (2) limited or suggestive evidence of an association; (3) inadequate or insufficient evidence to determine an association; or (4) limited or suggestive evidence of no association. *See* UPDATE 2018, at 67-68.

[2] Squamous cell carcinoma of the tonsil is a "common malignant tumor of the oropharynx." Christopher J. Skilbeck, et al., *Squamous Cell Carcinoma of the Tonsillar Remnant—Clinical Presentation and Oncological Outcome*, 2011 HEAD & NECK ONCOLOGY 3:4 (2011).

3

In response to a request for medical evidence, Mr. Edwards submitted two Board decisions from unrelated cases to the AOJ.[3] R. at 2610, 2778. Both granted service connection for squamous cell carcinoma, both featured medical exams furnished by VA for the claimants, and both relied heavily on opinions from private medical examiners to make their determinations. R. at 2610-11, 2613-15, 2620-23.

In the first decision, dated April 2015, the Board granted service connection to another veteran for carcinoma of the tongue. R. at 2612. It considered three medical opinions, two provided by the Agency and the third by a private examiner. The Board found that one VA exam was inconclusive and unhelpful to deciding the matter. R. at 2615. The Board explained that the other VA exam's explanation that Agent Orange exposure's complications did not include tongue carcinoma was probative. *Id*. It then turned to the private medical examiner's opinion, which it found adequate and compelling enough to put the evidence into equipoise. *Id*.

In the second decision, from September 2015, the Board granted service connection to another veteran for carcinoma of the right forearm. R. at 2622. There, the veteran's private examiner opined that, "although there was no definitive proof that herbicides cause skin cancers, it was his experience that exposure to herbicides was definitely a factor in the development of skin cancers," including the examined condition. R. at 2623. The Board conceded that negative nexus opinions from VA exams were valueless, but noted that sun exposure is a known cause of the condition and that the claimant had reported exposure to significant sunlight while in Vietnam. R. at 2623. It ultimately found that service connection was appropriate because the evidence was in equipoise as to whether the carcinoma was connected to exposure to herbicides and sun during service. *Id*.

Here we introduce *Update 2010*, the first NAS report at issue today. In his formulation of a positive nexus opinion, the private examiner reviewed *Update 2010* and various other studies. *Id*. After reading the report, the examiner said that there was a "biological mechanism by which the Veteran's herbicide exposure might have caused his cancer."[4] *Id*. Specifically, immune

---

[3] The Court recognizes that Mr. Edwards also submitted a third unrelated Board decision, from March 2018, to the AOJ. R. at 2617-19. Both parties seem to agree that this decision was correctly dismissed by the Board in the decision on appeal. We too agree. After all, the May 2018 decision concerned entitlement to an earlier effective date for a compensable rating for squamous cell carcinoma, while this matter concerns the preliminary issue of entitlement to service connection. R. at 2617.

[4] The *Update 2010* report found that there was inadequate or insufficient evidence to determine an association between squamous cell carcinoma of the tongue (including the tonsils) and herbicide exposure. NAT'L ACAD. OF SCI.,

4

alterations associated with herbicide exposure may increase susceptibility to an infection in the oral cavity and precipitate squamous cell carcinomas in that area. *Id*. Based on this theory and other unenumerated studies, the examiner opined that "scientifically, it was more likely than not that the Veteran's squamous cell cancer of the tongue was caused by or related to his in-service exposure to Agent Orange." *Id*.

The AOJ was unconvinced by Mr. Edwards's submission of the unrelated Board decisions. It denied service connection in a March 26, 2020, decision. R. at 2583. That decision did not note any consideration of NAS reports in its summary of the evidence. R. at 2598-99. The AOJ continued its denial in a higher-level review decision that reasoned that the submitted Board decisions could not prove a connection because they were based "on the medical evidence and service histories of other veterans." R. at 2267-75. This decision too noted no consideration of the NAS reports in its summary of the evidence. *Id*. Apparent at this stage in the proceedings is that the AOJ perceived no indication of a connection between Mr. Edwards's service and disability, for it might have otherwise discussed the Secretary's duty to assist. *See* 38 U.S.C. § 5103A.

Mr. Edwards appealed to the Board in May 2021. R. at 2235. He and his representative chose to pursue an appeal decision through the direct review docket and submitted an informal presentation arguing his case. R. at 20-21, 2235. These two features about Mr. Edwards's appeal are significant.

First, consider the process selected. R. at 2235. Under the Veterans Appeals Improvement and Modernization Act of 2017 (AMA), a claimant picks one of three appellate avenues: the hearing docket, additional evidence docket, or direct review docket. 38 U.S.C. § 7105(b)(3)(A)-(C); *see Andrews v. McDonough*, 34 Vet.App. 151, 157 (2021). These paths each present "different restrictions on the evidentiary record" before the Board and the window during which claimants are permitted to submit unconsidered evidence thereto. *Davis*, 36 Vet.App. at 147. By electing the direct review route, Mr. Edwards voluntarily restricted his evidentiary record to "the evidence of record at the time of the decision of the [AOJ] on appeal." 38 U.S.C. § 7113(a). As a result, the Board was limited to reviewing the evidence of record on March 26, 2020, the date of the AOJ's denial of service connection.

---

VETERANS AND AGENT ORANGE: UPDATE 2010, at 17-18 (2010).

Second, consider the informal presentation given to the Board. Its pages reference *Update 2012*, the other NAS report at issue here. Arguing that there is a positive nexus between herbicide exposure and squamous cell carcinoma, Mr. Edwards cited *Update 2012*, which repeats the "biological mechanism" theory also featured in *Update 2010*.[5] R. at 20. He indeed says that the evidence of record here "reflects an . . . infection leading to squamous cell carcinoma of the tonsil." *Id*. The informal presentation then asserted that the Secretary should have furnished Mr. Edwards with a medical exam, for the theory articulated in the NAS report was sufficient to indicate a connection between the cancer and herbicide exposure. *Id*.; *see* 38 U.S.C. § 5103A(d)(2)(b).

The Board then issued the August 5, 2024, decision on appeal here. It first reasoned that the unrelated Board decisions did not obligate VA to furnish an exam because their references to separate medical opinions were "too general and conclusory to indicate that there may be a nexus" linking the cancer to service. R. at 6-7. The decision then turned from the duty-to-assist argument and towards the merits of Mr. Edwards's theory of direct service connection.

There, too, the Board began its discussion by addressing the other Board decisions provided by Mr. Edwards. It emphasized that such decisions could be persuasive authority only, for "each case before the Board is decided on the basis of the individual facts" presented. R. at 8 (citing 38 C.F.R. § 20.1303). And the Board did not share the view that these past decisions were analogous to this case. As to the April 2015 decision, the Board found that Mr. Edwards failed to submit a private opinion, whereas that veteran submitted such an opinion. R. at 8. Though it plainly read the decision, the Board did not mention *Update 2010*. As to the September 2015 decision, the Board distinguished it because Mr. Edwards, unlike the claimant there, did not provide a private medical opinion. R. at 9. The Board also explained that sunlight exposure was not alleged as a cause of the disability here while it was deemed a possible cause in that decision. *Id*.

The informal presentation's reference to the *Update 2012* NAS report was mentioned in the Board's decision, just not in the manner Mr. Edwards wanted. Because the appeal arrived via the direct review pathway, the Board found that the report's contents could not be considered either as argument or evidence. R. at 9. To consider that report—or any such report—would be to rely on materials received by the Agency after the AOJ's decision. *Id*.; *see* 38 U.S.C. § 7113(a).

---

[5] Like its predecessor, the *Update 2012* report found that there was inadequate or insufficient evidence to show an association between squamous cell carcinoma of the tongue (including the tonsils) and herbicide exposure. NAT'L ACAD. OF SCI., VETERANS AND AGENT ORANGE: UPDATE 2012, at 8-9 (2012).

6

Mr. Edwards appealed the decision to this Court. In essence, he would have us remand the matter and require the Secretary to consider the NAS reports and furnish an exam. *See* Appellant's Brief (Br.) at 5-6. In his telling, the Board was required to address *Update 2012* because the Agency constructively possessed that report long before it denied the claim at the AOJ level. *Id*. at 13-14. He further disputes the Board's reasons or bases for its decision that a medical exam was not required, especially given that the conclusion found within *Update 2010* was raised to the AOJ through the unrelated April 2015 decision. *Id*. at 7-13.

### III. CONSERVING CONSTRUCTIVE POSSESSION

Mr. Edwards first argues that the Board failed to consider the *Update 2012* NAS report that should have been treated as evidence of record under our judicially wrought doctrine of constructive possession. Because one could reasonably expect an Agency-controlled report like *Update 2012* to be a relevant document in his case, *see Euzebio*, 989 F.3d at 1319, Mr. Edwards would have the Board discuss whether that evidence was included in the record *before* he decided to walk down the direct review pathway, Appellant's Br. at 13-14. We agree; had Congress or VA intended to deliver a knock-out blow to constructive possession via the AMA, it would have clearly stated that intent in the statute or regulations.

*A. The Doctrine*

This Court sometimes consults a doctrine called constructive possession when determining which documents reside in the appellate record. *See Varad v. McDonough*, 37 Vet.App. 198, 204 (2024); *Monzingo v. Shinseki*, 26 Vet.App. 97, 100-02 (2012) (per curiam), *overruled on other grounds by Euzebio*, 989 F.3d at 1305; *Bowey v. West*, 11 Vet.App. 106, 109 (1998). The genesis of this doctrine in our Court was *Bell v. Derwinski*, 2 Vet.App. 611, 613 (1992), in which we held that some documents "generated within the VA" were evidence that should have been considered by the Board. As the Court explained, because some pieces of evidence were created and held by VA, "the Secretary had constructive, if not actual, knowledge of those items." *Id*.

The doctrine has since evolved, but its emphasis on dominion, control, and knowledge of a document has remained the same. Its current iteration is best articulated in the Federal Circuit's decision in *Euzebio*. There, the court repeated the holding in *Bell* that "evidence that is 'within the Secretary's control' and 'could reasonably be expected to be a part of the record before the Secretary and the Board,'" is constructively part of the record. *Euzebio*, 989 F.3d at 1319 (quoting *Bell*, 2

7

Vet.App. at 613). The "correct standard" by which to test expectations, the court continued, "is relevance and reasonableness." *Id*. That version of the test has since been applied by this Court on multiple occasions. *See, e.g.*, *Davis*, 36 Vet.App. at 150-55.

Even though constructive possession is a mainstay of our evidentiary toolkit, the doctrine was not articulated in the operative statutes or regulations at the time of its announcement. Its birth was instead Athenian, seemingly bursting fully formed from the mind of this Court. *See Bell*, 2 Vet.App. at 613. Federal courts, however, are not all powerful and cannot create rules from nothing. *See Com. of Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 580-81 (1851) (Taney, J., dissenting); *Bilharz v. Collins*, 38 Vet.App. 366, 378-79 (2024). There must be some reasoning behind the doctrine's design.

Yet it is challenging to pinpoint how *Bell* initially concluded that constructive possession was a doctrine applicable in this Court. The opinion meanders through authority, including our jurisdictional statute and caselaw about duty-to-assist errors, to contextualize the legal topography. *See Bell*, 2 Vet.App. at 612-13 (first citing 38 U.S.C. § 7252(b), then citing *Murincsak v. Derwinski*, 2 Vet.App. 363, 372 (1992)). The notion that evidence that the Secretary has "constructive" knowledge and possession of must be included in the record, however, is not explicitly supported by any binding authority. *Id*. As best we can tell, the *Bell* Court created a new rule of decision using federal common law powers and informed by settled common law understandings about possession.[6] It is indeed difficult to view the decision differently, given that its citations focused on peripherally related concepts and did not possess the hallmarks of an interpretive conclusion.[7]

---

[6] Such rules of decision are generally disfavored here. *Cf. Rodriguez v. FDIC*, 589 U.S. 132, 133 (2020). Aside from constructive possession, we struggle to name another surviving doctrine created in the interstices of a statute.

[7] But not impossible. One might, for instance, view *Bell* as a poor interpretive exercise, focusing on section 7252(b). *See id*. Under this view, to the extent that common law played a role in that decision, it was either to contextualize section 7252(b) or to suggest that "before the Secretary and the Board" had a common-law meaning. *See, e.g.*, *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 468 (1942) (Jackson, J., concurring). Yet, even under this view, our decision that constructive possession survives the imposition of the AMA would not change. Our focus would become whether the best reading of the new statutory scheme displaces the doctrine. *See Lackey v. Stinnie*, 604 U.S. 192, 670 (2025) (citing *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017); *SEC v TheStreet.Com*, 273 F.3d 222, 233 n.11 (2d Cir. 2001). And, for the same reasons as we discuss in our interpretive endeavor below, VA has failed to provide a reading of the AMA that would plausibly, clearly, or most likely displace constructive possession. That same failure dooms a view of constructive possession tied only to the Federal Circuit's precedential endorsement or acceptance of the *Bell* doctrine. *See Euzebio*, 989 F.3d at 1319.

8

Courts can import background principles into their view of what a given authority requires. *See D'Oench*, 315 U.S. at 468. And they may fill the interstices of federal legislation concerning federal interests. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367 (1943); *see* Henry J. Friendly, *In Praise of Erie—and of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 421-22 (1964). Applying these general principles and a generous definition of federal common law best accounts for the Court's decision in *Bell* to look beyond the written law when crafting the rule of decision that constructively possessed evidence was properly included in the record. *See* Thomas W. Merrill, *The Common Law Power of Federal Courts*, 52 U. CHI. L. REV. 1, 5 (1985) (defining "federal common law" as a "federal rule of decision that is not mandated on the face of some authoritative federal text").[8]

Reading between the lines of our appellate process, we found that documents that were effectively before VA were part of the record, although nothing in the written law demanded that conclusion. *Bell*, 2 Vet.App. at 613. But like all good common law reasoning, our conclusion in *Bell* was not formed in a void, but through historic and settled legal precepts. *See id.*; *D'Oench*, 315 U.S. at 468; *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 259 (1979) (employing long-recognized legal understandings when operating in a federally controlled area of law). The precept at issue here, an idea that possession "occurs when one has knowledge of the thing possessed 'coupled with the ability to maintain control over it'," has a lengthy pedigree. *Aqua Log, Inc. v. Georgia*, 594 F.3d 1330, 1336 (11th Cir. 2010) (quoting *United States v. Wynn*, 544 F.2d 786, 788 (5th Cir. 1977)).

This aspect of ownership traces its roots to the same British soil that provided other common law doctrines that still shape our law. Edward R. Cohen*, The Finders Cases Revisited*, 48 TEX. L. REV. 1001, 1015-16 (1970). Dominion and control over an object, the common law said, constitute legal possession, even without evidence of physical possession. *See* OLIVER

---

[8] We take this opportunity to note two things about federal common law. First, we understand that some definitions are broad, *see generally* Louise L. Weinberg, *Federal Common Law*, 83 NW. U. L. REV. 805 (1989), while others would cabin federal common law powers, *see* MARTIN L. REDISH, THE FEDERAL COURTS IN THE POLITICAL ORDER 29-46 (1991). Indeed, it is difficult to pin down this elusive concept. *See* Merrill, *supra*, at 5; RICHARD H. FALLON, JR., ET. AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 643-656 (7th ed. 2015). We presented a broader view to account for the possible ways the Court in *Bell* could have viewed their lawmaking powers, but do not adopt that view as a general matter. Second, federal common law has an interpretive side, which encourages courts to import a well-settled common law understanding of a subject into a statutory text invoking that subject. *See, e.g.*, *Kousisis v. United States*, 605 U.S. 114, 124 (2025); *Rios v. Nicholson*, 490 F.3d 928, 930-32 (Fed. Cir. 2007) (citing *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884)). Considering common law definitions as part of an interpretive exercise gives us less pause than does creating a broader rule of decision.

9

WENDELL HOLMES, JR., THE COMMON LAW, 216 (1881). Indeed, former law students will doubtless remember that a "wounded, circumvented, and ensnared" fox is the rightful property of his pursuer. *Pierson v. Post*, 3 Caines 175, 179 (N.Y. 1805). Our revisitation was not uncommon; even today, use of the doctrine is ramulose, emerging in a variety of contexts. *See, e.g.*, *Henderson v. United States*, 575 U.S. 622, 626 (2015) (outlining constructive possession in the criminal law); *Cline v. Kaplan*, 323 U.S. 97, 100 (1944) (bankruptcy); *Smith v. Gale*, 144 U.S. 509, 526 (1892) (real estate).

Yet even well-established common law doctrines must yield to legislative directives. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423-24 (2011). Discerning when a doctrine is displaced, however, is no easy task. After all, when omnipresent, federal common law commands respect from the legislature and the judiciary alike. "Congress is understood to legislate against a background of common-law adjudicatory principles," *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 108 (1991), and our cases employ "a presumption favoring the retention of long-established and familiar principles," *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952).

Still, those background principles are preempted when a statute "'speak[s] directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). As applied here, we will presume that our doctrine of constructive possession remains in inertia unless a clear statement disposes of it. *See Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) (explaining that canons of statutory interpretation apply also to regulations). After all, the legislature would not likely banish the longtime legal understanding of possession silently, especially since it was well-established in our caselaw by the time Congress passed the AMA.[9]

The Secretary declares that our strain of constructive possession has been rendered mostly defunct, if not by our precedent, then by commands in the AMA and its implementing regulations. Secretary's Br. at 14-23. The AMA's neoteric docket selection system, he asserts, is incompatible with a doctrine that could require VA to consider new evidence at the Board level. Secretary's

---

[9] There is, to be sure, a strong argument that clear statement rules, like the one preserving federal common law, exist uncomfortably in a textualist interpretation. *See* ANTONIN SCALIA, A MATTER OF INTERPRETATION 27–29 (1997) (arguing that clear statement rules, as substantive canons, "load the dice for or against a particular result"). Thus, "academics and the Supreme Court have rightfully plumbed the analytical foundations of clear-statement rules." *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 n.5 (4th Cir. 2023) (citing Stephen E. Sachs, *The Law of Interpretation*, 130 HARV. L. REV. 1079, 1122-28 (2017)). But an inferior court like ours can only complain of discomfort before applying the clear statement rule prescribed to us.

10

Supp. Br. at 4-7. He would have us determine that the Agency relegated post-AMA constructive possession only to certain VA hospital records mentioned in a regulation that we will consult later. *Id*. at 1-3.

### B. The Caselaw

Despite the contentions of both parties, we have yet to describe constructive possession's shape in post-AMA litigation. In many instances, this Court or the Federal Circuit employed the doctrine, but none concern an entirely AMA veteran's attempts to prove constructive possession of evidence after voluntarily closing the record. While the Secretary's citations address only circumstances auxiliary to the doctrine's heartland, Mr. Edwards's offerings do little more than restate the legacy conception of constructive possession.

Begin with Mr. Edwards's frequent references to the Federal Circuit's decision in *Euzebio*. Appellant's Br. at 13-14; Appellant's Supp. Br. at 3-6. To be sure, its facts are initially reminiscent of the background here: Following an adverse regional office decision in September 2011, the veteran argued that the Board needed to consider the *Update 2014* NAS report, published during his appeal, before denying him a VA exam. *Euzebio*, 989 F.3d at 1315-16. The Board and this Court disagreed because the update offered no "direct relationship to the claim on appeal." *Id*. at 1317 (quoting *Euzebio v. Wilkie*, 31 Vet.App. 394, 397 (2019)). The Federal Circuit reversed, determining that we had narrowed our rules for constructive possession such that they conflicted with the perceived purposes of the Secretary's statutory duty to assist and the Agent Orange Act. *Id*. (first citing 38 U.S.C. § 5103A(a)(1), then citing Agent Orange Act, 105 Stat. at 11). It therefore sent back the claim so that the Board could consider *Update 2014* in the first instance. *Id*. at 1326.

Although instructive in framing the functions and fundamentals of constructive possession, *Euzebio* is inapposite to the issues presented here. The procedure in *Euzebio*, after all, flew naturally above the tangle of AMA commands that matter in this appeal. Because the decision there was issued in July 2017, during the legacy era, the court had no reason to doubt whether the constructive possession doctrine could apply. *Id*. at 1315; *see Godsey v. Wilkie*, 31 Vet.App. 207, 214 n.2 (2019). This matter, however, rests only within the AMA's encincture and questions the doctrine's survival given the new evidentiary and duty-to-assist limitations.[10] Thus, *Euzebio* is

---

[10] The Court recognizes that, even in the legacy appeals system, the Secretary was vexed by the doctrine and sought to dismiss it as colliding with 38 U.S.C. § 7252(b) because we construed the record of proceedings to include evidence not before VA adjudicators at the regional level. *Id*. at 1322. But the Federal Circuit disagreed, *id*. at 1322-23, and the Secretary does not attempt renewal of that argument. Even if he did, the query here depends on what we

helpful in the pedagogic sense of outlining constructive possession, but it does not control our disposition here.

The same is true for our decision in *Davis*, which Mr. Edwards would now have us employ as a blueprint for AMA constructive possession cases. Appellant's Br. at 14 (asserting that *Davis* implicitly found all Agent Orange Act reports to be constructively before the Board); Appellant's Supp. Br. at 9. Our review, however, reflects that the *Davis* blueprint was not written to scale for AMA cases. Because VA issued the regional office decision during the legacy period, the rules of that time applied, including constructive possession. *Davis*, 36 Vet.App. at 145-46. Only later did the AMA amend the appellate procedure. Mr. Edwards only traversed the modernized system. Thus, as with *Euzebio*, our decision in *Davis* does not meaningfully inform this case because we had no reason to square constructive possession with the limitations found within the AMA.

Mr. Edwards pushes back, asseverating that we did not delineate a distinction between the regimes and had instead indicated that constructive possession should apply no matter the posture of the appeal. Appellant's Reply Br. at 10. But we did, in fact, separate the application of legacy rules from the AMA's rules when discussing the evidence of record. *Davis*, 36 Vet.App. at 154-55 (considering a regulation that applies during legacy appeal periods). And, as a general principle, a precedent's failure to comment on potential applications does not negate the consequences of any factual differences between the initial case and a later case. Rather, "an expression in an opinion yields later to the impact of facts unforeseen." *Jaybird Mining Co. v. Weir*, 271 U.S. 609, 619 (1926) (Brandeis, J., dissenting). *Davis*, then, is helpful in applying the doctrine, especially when NAS reports are involved, *see* 36 Vet.App. at 156-57 (Falvey, J., concurring), but gets us no closer to figuring out the doctrine's post-AMA durability.

The Secretary's position is likewise more grounded in hope than in precedential analogy. His strongest champion is *Hyatt v. Shinseki*, 566 F.3d 1364 (Fed. Cir. 2009). Secretary's Br. at 21. At issue in that case was whether certain court-martial records were included in the appellate record for a claim for accrued benefits. *Hyatt*, 566 F.3d at 1370-71. The evidence supporting such a claim must be limited to that of record at the time of a veteran's death. 38 U.S.C. § 5121(a). Because the court-martial records were not part of the record at the time of the death in question, the Federal Circuit found that section 5121(a) prohibited their inclusion. *Hyatt*, 566 F.3d at 1370.

---

consider to be before VA adjudicators at the AOJ level, so that past objection would be tangential to this controversy.

12

It explained that the ability to "enlarge the universe of evidence upon which accrued benefits claimants may rely" is controlled by Congress alone. *Id*. at 1371.

We understand the point the Secretary tries to make, but his comparison misses the mark. Our decision in this case would not enlarge the universe of evidence that the Board needs to consider. *See* Secretary's Br. at 21. To the contrary, the entire point of constructive possession is to determine which evidence was *already* of record when the evidentiary window closed at the AOJ level. Until otherwise decided, therefore, our doctrine is considered harmonious with the command that "the evidentiary record before the Board shall be limited to the evidence of record" at the time of the AOJ decision. *See* 38 U.S.C. § 7113(a) (indicating that the Board must consider everything that is properly in the record before it); *see Texas*, 507 U.S. at 534.

The *Hyatt* decision indeed reasoned that including the court-martial records would expand the universe of permissible evidence because those records violently mismatched with the pillars of constructive possession. *Hyatt*, 566 F.3d at 1371 (finding that, unlike other records, the court-martial records were "not generated by, submitted to, or otherwise within the VA's possession or control" at the time of the veteran's death). This case, however, concerns the inclusion of NAS reports and these documents not only live at the nucleus of possession, control, and relevance, but they also exist outside the restrictions placed by *Hyatt* in the accrued benefits context.

The Federal Circuit, when discussing constructive possession in *Hyatt* and its later cases, expressed no concern that the doctrine could violate the evidentiary restrictions placed on the Board. *See Lang v. Wilkie*, 971 F.3d 1348, 1353-55 (Fed. Cir. 2020); *Hyatt*, 566 F.3d at 1370-72. If anything, the court seemed to rely on the doctrine's staying power in our Court and its twin prongs of relevance and reasonableness. *See Euzebio*, 989 F.3d at 1322-26; *Hyatt*, 566 F.3d at 1371. The Secretary's discussion of *Hyatt*, therefore, does little to aid his arguments.

His parenthetical references to other cases are similarly fruitless. Secretary's Br. at 21 (first citing *Mil. Veterans Advoc. v. Sec. of Veterans Aff. (MVA)*, 7 F.4th 1110, 1140 (Fed. Cir. 2021), then citing *Aviles-Rivera*, 35 Vet.App. at 278). The reason that the AMA's restrictions would have been "rendered meaningless" by including the NAS report in *Aviles-Rivera* is because that report was published *after* the date of the AOJ decision that marked the end of the evidentiary window. 35 Vet.App. at 275. To include that report would indeed run afoul of the directive to bar evidence following the AOJ decision. *Id*. at 178.

13

But here, the *Update 2012* NAS report was published many years *before* Mr. Edwards's claim was denied by the AOJ. *See* R. at 2583. If the doctrine constructively places the report before the AOJ by the date of its decision, therefore, the report could be a proper part of the record without disturbing evidentiary deadlines. *See* 38 U.S.C. § 7113(a). In other words, the report would not be considered "submitted" to the Board after the AOJ decision in violation of the AMA; it was always there. *See Andrews v. McDonough*, 34 Vet.App. 151, 158 (2021).

And in the short part of *MVA* that the Secretary cites, the Federal Circuit did not touch on constructive possession. It investigated the lawfulness of 38 C.F.R. § 14.636(c)(1)(i), a regulation concerning the payment of attorney fees, in light of the AMA. *MVA*, 7 F. 4th at 1137-42. To the extent that the Secretary makes the point that cleaving to constructive possession would do "little justice" to the AMA should it expand the direct review docket's evidentiary window past its mandate, fair enough. *See id*. at 1140. But, as we elucidate later, the AMA's provisions do not end constructive possession, *see Texas*, 507 U.S. at 534, nor do they create an environment so toxic as to compel the doctrine's expulsion.

There is no shortage of authority concerning how constructive possession applies and the importance of keeping the AMA's tripartite procedure protected. And yet, "[a]propos of the central point at issue, directly pertinent precedent ranges from slim to none. So, we write on what amounts to a clean slate." *In re Martin*, 817 F.2d 175, 176 (1st Cir. 1987).

### C. The Statute

Recall that, to displace our longstanding doctrine of constructive possession, the AMA or its regulations must override the doctrine by "speak[ing] directly" to its application. *See Texas*, 507 U.S. at 534; *City of Milwaukee v. Ill. & Mich.*, 451 U.S. 304, 315 (1981). If even a "plausible interpretation of the statute" preserves an unconstrained place for the doctrine, Congress has failed to provide requisite intent. *FAA v. Cooper*, 566 U.S. 284, 290 (2012). Yet the legislature need not "incant magic words" to create a clear statement. *Sebelius v. Auburn Regional Medical Center*, 568 U.S. 145, 153 (2013). Rather, the traditional tools of statutory construction must show that the abrogation of our common law is "clearly discernable" from either wording or structure. *Cooper*, 566 U.S. at 291; *see Lac du Flambeau of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388-92 (2023). The provisions highlighted by the Secretary fall short of the "demanding standard" needed to eclipse *Bell*'s rule. *See Lac du Flambeau*, 599 U.S. at 388.

14

The Secretary primarily relies on 38 U.S.C. § 7113(a), which limits the Board's review to the "evidence of record at the time of the decision of the [AOJ]" in direct review appeals. Section 7113 serves as the structural linchpin of the AMA, through which "Congress sought to create a more orderly system that places clear restrictions against adding new evidence late in the process, thereby giving the Board greater certainty as to the evidentiary record's contents when deciding an appeal." *Cash v. Collins*, 166 F.4th 1046, 1051 (Fed. Cir. 2026). Among the AMA's three options, direct review under section 7113(a) is the only route that permits no "submission of additional evidence." *Brack v. McDonough*, 37 Vet.App. 172, 178 (2024). Put differently, the subsections directing the other review lanes allow the claimant an opportunity to submit additional evidence after the AOJ's decision, while the direct review lane does not. *Compare* 38 U.S.C. § 7113(a) with 38 U.S.C. §§ 7113 (b)(2) and (c).

At first blush, the AMA's statutory commands and structure seem to preclude consideration of *Update 2012*, which Mr. Edwards mentioned to the Board after the AOJ decision. R. at 20. But if VA is held to have already possessed the report through the constructive possession doctrine, then the statute does *not* preclude consideration: Mr. Edwards did not submit "additional evidence" in his argument to the Board, but simply pointed to evidence that was already part of the evidentiary record under our caselaw. *See Cash*, 166 F.4th at 1051; *Brack*, 37 Vet.App. at 178.

This is supported by the statute. The directive not to permit "*additional* evidence" in the direct review route leaves open the possibility that some constructively possessed evidence might not be covered. 38 U.S.C. § 7113(a) (emphasis added). "We construe 'additional' in the ordinary sense of the word, to mean supplemental." *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979) (outlining the ordinary meaning canon)). Adopting that construction, section 7113 disallows the inclusion of evidence *supplemental* to the record in the direct review docket. Since constructive possession's point is to figure out what *was included* in the record, evidence so possessed would not be "additional" to the AOJ's proceedings and thus not implicated by the statute. That reading prevents us from heralding the doctrine's demise. *See Cooper*, 566 U.S. at 290.

Finding no preemption in the AMA's delineation of the three review dockets, we continue to its notice requirements, which also bring up the subject of evidence before the AOJ. Under 38 U.S.C. § 5104(b), an AOJ decision must feature a "summary of the evidence considered" and an "explanation of how to obtain or access" the evidence. The Secretary says that this notice provision

15

reflects the AMA's implicit understanding that "the record will be limited to what was already considered, that is, the evidence summarized in the [AOJ's] decision." Secretary's Br. at 16; *see* Secretary's Supp. Br. at 6-7.

But that theory defies the wording of the statute. The statute's requirement that VA provide a summary of the evidence the AOJ considered could not reasonably mean that the evidence so summarized makes up the whole universe of the evidence of record. It is more plausible that the statute requires the AOJ to exclusively credit the evidence it *reviewed* rather than advertise all *possible* evidence it could have consulted. Thus, a document that was placed in the record does not vanish if the AOJ fails to list it in the summary; rather, the AOJ might commit an error by not considering any included and relevant evidence. The statute even qualifies "evidence" along that line as either evidence "considered by the Secretary" or "evidence used in making the decision." 38 U.S.C. §§ 5104(b)(2), (6).

Such qualifications might imply a body of potentially relevant evidence from which the AOJ draws to make their determinations; the AOJ's singling out of certain evidence does not mean that additional evidence was unavailable. *Cf. Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 864-65 (D.C. Cir. 2001). Because Congress chose to feature *some* evidence rather than have the AOJ identify *all* the evidence of record, we find that it is plausible that constructively possessed evidence might simultaneously be before the AOJ but not summarized in its notice letter. Put another way, an NAS report might be de facto record evidence, just not evidence consulted and listed in the AOJ's decision. Summaries, by definition, are not intended to be comprehensive; that evidence might be left out of a summary does not make that evidence any less a part of the record.

As this interpretation of section 5104(b) remains harmonious with constructive possession, we find no preemption of the doctrine within the decisions and notice directive. *See Cooper*, 566 U.S. at 290. Indeed, it would be strange to discover that Congress had preempted our doctrine about which evidence is of record in a provision outlining the elements of notice. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (noting that Congress does not presumably hide elephants in mouseholes). At its best, then, this provision reflects that there may be a notice issue should the AOJ fail to identify evidence it considered or indication of some other error if the AOJ did not consider constructively possessed evidence. But Mr. Edwards makes no such allegation, so we continue to the next statutory command in the Secretary's pageant.

16

Under 38 U.S.C. § 5108(a), a claimant may file a supplemental claim by providing VA with new and relevant evidence. According to the Secretary, the availability of supplemental claims nullifies the need for constructive possession; veterans will be able to place constructively possessed evidence before the AOJ through that process. Secretary's Br. at 18-20; Secretary's Sup. Br. at 4-5. The ability to reopen a claim, however, does not explain whether a document was before the AOJ at the time of its decision.[11] *See Davis*, 36 Vet.App. at 150-51.

The supplemental claims section, in other words, does not clearly speak about constructive possession and is thus unable to bury it. *See Texas*, 507 U.S. at 534. Despite the Secretary's belief, the doctrine is not rendered superfluous by supplemental claims any more than one AMA docket option negates others. Rather, if a constructively possessed document can warrant readjudication of a veteran's claim, that veteran may choose either to pursue such readjudication of the claim or to demand that the Agency consider the evidence constructively before it. *Cf.* 38 U.S.C. § 7105(b)(3). That section 5108(a) leads to consideration by the AOJ, in other words, does not render other methods leading to AOJ consideration automatically useless. *See Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1343 (Fed. Cir. 2019) (Prost, C.J., dissenting in part). Nor does the role of evidence in the supplemental claims section change the fact that some evidence might be constructively possessed. *See Cooper*, 566 U.S. at 290.

The Secretary finally turns our attention to 38 U.S.C. § 5103A(e), which limits his duty to assist to the period before VA issues notice of the AOJ's decision. He argues that, if the Board must remand a matter for the AOJ to add certain constructively possessed documents to the record, the AMA's duty to assist limitation would be made meaningless because VA would be ordering assistance past the prescribed timeline. Secretary's Br. at 18-23.

Thus sprouts a recurring theme in the Secretary's position: the conflation of his duty to assist with constructive possession. *See Hamilton v. McDonough*, 37 Vet.App. 228, 236 (2024) (explaining the distinction). The former requires the Secretary to "assist a claimant in obtaining evidence necessary to substantiate the claimant's claim for benefits." 38 U.S.C. § 5103A(a)(1). The latter commands that "all record documents reasonably expected to be part of a veteran's claim are included in the administrative record." *Conyers v. McDonough*, 91 F.4th 1167, 1171 (Fed. Cir.

---

[11] The Secretary tells us that constructive possession runs headlong into his definition of "new" evidence as "not part of the actual record before agency adjudicators." Secretary's Supp. Br. at 4. Yet the definition he points to does not further explain what "actual record" means, and the very point of constructive possession is to determine what evidence is actually in the record at the time of the AOJ's decision. *See* 38 C.F.R. § 3.2501(a)(1) (2026).

17

2024). Though these two concepts are naturally complementary, *see Euzebio*, 989 F.3d at 1321, nothing cabins constructive possession to a remedial doctrine fixing duty-to-assist errors, *see id.*; *Lang*, 971 F.3d at 1354-55; *Dunn v. West*, 11 Vet.App. 462, 466 (1998).

This means that, although section 5103(A)(e) limits duty-to-assist issues to the period before the AOJ decision, it does not constrain constructive possession. *See Texas*, 507 U.S. at 534. It is indeed unclear how the duty and the doctrine could be coterminous in a way that defeats Mr. Edwards's claim. If the document is already being viewed as constructively before VA, it is automatically evidence of record. And there is no way for the duty to assist a veteran to apply to a document the Secretary already possesses.[12]

In passing the AMA, Congress established evidentiary limits for its three dockets, but it did not stop the Board from reviewing what evidence was constructively before the AOJ at the time the evidence submission window closed. And although it tinkered with notice, duty-to-assist, and claim requirements, Congress enacted no change directly conflicting with the Board's ability to ensure that documents before the AOJ were correctly considered. Our reprise of the AMA's greatest hits therefore reflects that the constructive possession doctrine has a place in VA's appellate process and could apply here. *See Cooper*, 566 U.S. at 290; *Texas*, 507 U.S. at 534.

### D. The Regulations

The Secretary's last recourse against the doctrine is his own regulatory prescriptions. After all, if constructive possession has been sliced thin by regulation, the Board might not have erred in failing to discuss *Update 2012*. *See* 38 U.S.C. § 7104(a). The Secretary presents a cavalcade of allegedly doctrine-busting regulations, but we find the doctrine stands.[13]

The most salient regulation we parse today is 38 C.F.R. § 3.103(c), which the Secretary tells us anchors the "inescapable conclusion" that AOJ adjudicators may not, for the most part, consider constructively possessed evidence. Secretary's Supp. Br. at 1-3. Our tour of this regulation begins with § 3.103(c)(1). Setting the stage, it mandates that the Agency "will include in the record,

---

[12] The Secretary might be referencing how the Board would review a document that is not in the electronic claims file, but the mechanics of how to view such records are not an administrative concern for the law. And, when it comes to NAS reports, we assume that the Board can find them.

[13] Given that no direction or necessary inference in the AMA banishes constructive possession from our judicial toolkit, we wonder whether the Secretary *could* finalize a regulation that draws an opposite view of the statute. *See Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 400-04 (2024). But because we do not read VA's regulations to do away with constructive possession anyway, we need not consider that question further.

18

any evidence . . . submitted by the claimant in support of a pending claim . . . except as provided in (c)(2) of this section and § 3.2601(f)."

As one might predict, subsection (c)(2) involves the "treatment of evidence received after the notice of decision."[14] Since the evidentiary window closes at the moment of the AOJ's decision, the regulation reaffirms that the AOJ cannot consider or act on post-decision evidence that is either "submitted by a claimant, associated with the claims file, or constructively received by VA as described in paragraph (c)(2)(iii) of this section," nor will any such evidence "be considered part of the record at the time of any decision by the [AOJ]." § 3.103(c)(2).

There are, however, exceptions to the exception. The AOJ may consider late evidence if it is accompanied by a completed supplemental claim application, § 3.103(c)(2)(i). It could do the same if it receives a claim remanded for a duty-to-assist error, which includes some errors that stem from a constructive possession problem, § 3.103(c)(2)(ii).

We are mostly interested in the third and final exception to the bar on review of evidence received after a decision date. Under § 3.103(c)(2)(iii), treatment records within the "actual custody" of the Veterans Health Administration (VHA) are deemed "constructively received" by VA at the time it learned of the records "through information furnished by the claimant sufficient to locate those records." In this way, the regulation sought to amalgamate aspects of the duty to assist with constructive possession; it puts a greater burden on a claimant to raise the alarm that a relevant and unconsidered document might be in VA's care. *See* § 3.103(b)(2)(iii) (citing 38 U.S.C. § 5103(A)(c)).

But no part of the regulation removes the *original* constructive possession doctrine from an AMA appeal. Assuming, for the sake of argument, that VA *can* limit or destroy constructive possession through a regulation, we search the regulation's text for a clear statement that prohibits the doctrine's use. *See Texas*, 507 U.S. at 534; *Smith*, 35 F.3d at 1523; *Holmes v. Wilkie*, 33 Vet.App. 67, 70 (2020). Our reading of the regulation uncovers an escape hatch for constructive possession's current form. That necessarily ends our analysis. *See Cooper*, 566 U.S. at 290.

---

[14] The second exception to § 3.103(c)(1)'s general rule explains that, as with Board reviews, the evidentiary record in a higher-level review is limited to that of record at the date of the AOJ's decision. 38 C.F.R. § 3.2601(f). The next subsection, however, carves out an exception aimed at rectifying duty-to-assist errors: the adjudicator will remand a claim to the AOJ if such an error exists and the maximum benefit for the claim cannot yet be granted. § 3.2601(g). More on that later.

19

Recall that (c)(2)(iii) defines constructive possession in a particular manner, requiring VA to have actual knowledge of a document described by a claimant. The regulation limits the doctrine only insofar as that definition is concerned. § 3.103(c)(2). The takeaway is that the AOJ is unable to employ this conception of constructive possession to include evidence (aside from qualifying VHA records) into the record past the time of its decision. Right away, we notice that this regulation deals with the exclusion of evidence submitted after the AOJ issued its decision and does not comment on evidence that might have been before the Agency before that date.

Then account for the regulation's emphasis in (c)(2)(iii) on VHA records. That provision explains that the Agency may sometimes consider post-decision evidence if the evidence at issue is a VHA record that it has actual knowledge of and that was identified by the claimant. However, the regulation does not focus the spotlight on any evidence that preexisted the AOJ decision and could reasonably be expected to be part of the record. Thus, by ignoring the well-established use of constructive possession that highlights record evidence before the AOJ's decision, the regulation only cabins the doctrine's use to certain VHA records that the Veterans Benefits Administration did not obtain as described in (c)(2)(iii). It does little to signal additional restrictions, and it does not make such signals with the level of clarity we require to remove the doctrine's force.

Although it is sufficient for our purposes that the regulation addresses only post-decisional evidence, and VHA records in particular, we note that our construction would remain the same even if the regulation applied to pre-decisional evidence. This is because the regulation bars the viewing of certain evidence when it has not been identified by the claimant and when VA has no knowledge of it. § (c)(2)(iii). However, the constructive possession doctrine, as it has been understood for decades, has not been described that way. It instead looks to the relevance of a document and whether one would reasonably expect it to have been included in the record. *Euzebio*, 989 F.3d at 1321; *Lang*, 971 F.3d at 1354-55. That visage of the doctrine went unaddressed by the regulation.

In summation, § 3.103(c)(2)'s bark is worse than its bite. It applies to post-decisional evidence, allowing in only certain VHA records from that post-decisional pool of would-be evidence. It does not, however, limit constructive possession's application to evidence that would reasonably be in the record at the time of the AOJ's decision. Put differently, it does not offer solutions for an NAS report that was possibly of record before the AMA's evidentiary cutoff point. Had the Agency wished to bury constructive possession, it should have just said so.

20

Other regulations likewise do not withstand this analysis, due mainly to contextual distinctions. Take 38 C.F.R. § 20.1403(b)(2), for instance. That regulation articulates a "special rule" for legacy appellants alleging the presence of a clear and unmistakable error (CUE) in a past Board decision. The record reviewed in those legacy cases must include relevant evidence possessed by the Agency "not later than 90 days before such record was transferred to the Board" so long as that evidence "could reasonably be expected to be part of the record." § 20.1403(b)(2). Not only is that record limited to the CUE context, but it does little more than simply preserve the legacy rules of evidence collection in legacy cases, including constructive possession's force even after the date of an AOJ decision.

Insisting that the duty-to-assist's principles are still relevant here, the Secretary next cites two other regulations, 38 C.F.R. §§ 3.2601(g) and 20.802. Secretary's Supp. Br. at 2. The former, dealing with higher-level reviews, ensures that an agency adjudicator will check for duty-to-assist errors and send a claim back to the AOJ for correction if such an error is identified at that juncture. § 3.2601(g). That regulation is complemented by its preceding paragraph, also mentioned in our discussion of § 3.103(c)(1), which closes the higher-level review's record as of the date of the AOJ's decision and forbids the adjudicator from developing additional evidence. § 3.2601(f).

Unless the Secretary seeks for us to conflate the duty to assist with constructive possession, we fail to see the relevance of these provisions. The regulations define higher-level adjudicators' role in the docket lanes by repeating that evidence is limited to that of record before the AOJ. But as we relayed earlier, some evidence might be constructively possessed by the AOJ at the time of its decision and thereby land outside § 3.2601(f)'s curfew. Evidence cannot be "additional" if it is already there. Though the regulation reinforces the AMA-inspired restrictions on the duty to assist, it does not speak clearly as to which evidence is constructively before the AOJ nor does it attempt to purge the process of constructive possession.

The second regulation the Secretary highlights, § 20.802, describes the situations in which the Board must remand a claim to the AOJ for further development. We are once again confused as to why the Secretary believes this regulation would favor his cause. Although it must remand a matter so that the AOJ could rectify duty-to-assist blunders, the Board is permitted to do so to correct other errors in "satisfying a regulatory or statutory duty, if correction of the error would have a reasonable possibility of aiding in substantiating the appellant's claim." § 3.20.802(a); *see Gladish v. Collins*, 39 Vet.App. 1, 14 (2025). Whether Board remands concerning constructive

21

possession are available, however, is beyond our mandate today. *Cf. Witkowski v. Collins*, 38 Vet.App. 459, 476 (2025) (en banc).

### E. The Consequences

With no caselaw, statute, or regulation thwarting the current iteration of the *Bell* doctrine in AMA cases, all we have to decide is what to do with the facts given to us. As a preliminary matter, there is no reason to depart from our current understanding of the doctrine just because the AOJ (instead of the Board) may have had the *Update 2012* NAS report. "The correct standard for constructive possession, as articulated in *Bell* and later *Lang*, and as applied throughout veterans benefit law, is relevance and reasonableness." *Euzebio*, 989 F.3d at 1321; *Coyners*, 91 F.4th at 1172 (remanding a case so that *Euzebio* could be applied).

At this point, the Secretary throws a Hail Mary pass, protesting that these principles render it impossible to discover what is properly in the record. Secretary's Supp. Br. at 8. The protestation, however, involves a misdirection. The Secretary questions how the Board may determine whether the AOJ considered unlisted, constructively possessed evidence such that it could do the same. *Id*. We do not assume that the AOJ *did* consider such invisible evidence; our analysis instead focuses on the methodology used to determine which evidence made its way into the evidentiary bunker and which did not. *See* Dec. 19, 2025, Court Order at 1 (requesting a response discussing how the AOJ or the Board might determine "whether certain documents were constructively before the AOJ").

The Board is thus free to identify whether the evidence at issue was an implicit part of the record at the time of its closing. It might decide that constructively possessed but ignored evidence at the AOJ level constitutes an error under § 20.803(a) and remand a claim so that the AOJ could consider that evidence first, as it would when rectifying a duty to assist error. *See* 84 Fed. Reg. 141 (noting that if the Board became "aware of a document within the scope of *Bell*, the record can be corrected"). And even if we allowed the Secretary's misdirection to hypnotize us, his point is obviated by our discussion of section 5104(b) above. Compliance with section 7113(a), we established, does not require evidence to be logged and considered below so long as it is "evidence of record" at the time of the AOJ's decision.

To the extent that the Secretary laments that the effect of our decision will be to extend the length of time needed to get an appeal off the ground, *see* Oral Argument (OA) at 26:50-27:30, available at https://www.youtube.com/watch?v=XpioS_RENPo, concerns about timeliness cannot

22

supplant our interpretive endeavor. *See Patel v. Garland*, 596 U.S. 328, 346 (2022) ("[P]olicy concerns cannot trump the best interpretation of the statutory text."). Moreover, his silver bullet—supplemental claims—is not the panacea he advertises. To file a supplemental claim, a claimant must submit new and relevant evidence. 38 C.F.R. § 3.2501. Overcoming that hurdle and possibly appealing an adverse newness and relevancy finding could take more time than asking for a review of relevant evidence during a normal appeal. *Cf.* OA at 45:32-46:00; *Williams v. McDonough*, 37 Vet.App. 305, 311-12 (2024) (holding that prejudicial error exists when forcing claimants to undergo the "new and relevant" step rather than allowing normal evidence submission).

At this point, we could apply the brakes and remand the matter for the Board to determine whether the NAS reports Mr. Edwards identified were constructively possessed by the AOJ. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998). But here, there is nothing left for the Board to voice on the subject. We will instead send this case back with instructions to consider both *Update 2010* and *Update 2012* when determining whether the Secretary owed Mr. Edwards an exam. *See id.*; *Euzebio v. McDonough*, No. 17-2879, 2021 WL 2124303, at *3 (Vet. App. May 26, 2021) (mem. dec.) (deciding whether an NAS report was before the Board). Ere our evaluation extends, our edict engenders excess expression.

The NAS reports have a unique role compared to other types of evidence. Unlike much documentation, these reports have an extensive history of "veteran engagement" and fulfill the congressionally mandated purpose of providing VA with "'independent scientific review of the available scientific evidence regarding associations between diseases and exposure to dioxin'." *Euzebio*, 989 F.3d at 1320 (quoting Agent Orange Act, 105 Stat. at 11). Given their notoriety, courts have held the Agency to be "on notice as to the information contained therein" when deciding a case like this. *Id.* at 1314.

It is unsurprising, therefore, that NAS reports are viewed as the "poster child" for evidence ripe for constructive possession. OA at 28:20-28:35. At least as to Agent Orange cases, the reports are expected to breach the relevancy roadblock because their associational findings tend to prove or disprove the likelihood of a medical nexus between service and disability. *See Lang*, 971 F.3d at 1354; *AZ v. Shinseki*, 731 F.3d 1303, 1311 (Fed. Cir. 2013). A similar analysis likely awaits an adjudicator when deciding whether an NAS report "can reasonably be expected to be connected" to the claims. *Lang*, 971 F.3d at 1355.

23

Taken together, these points and decisions reflect that "a widely cited report established by Congress to address the relationship between herbicides and service comes [into the record] when the claim involves questions about whether herbicides caused the veteran's disability." *Davis*, 36 Vet.App. at 157 (Falvey, J., concurring); *see Euzebio*, 31 Vet.App. at 408-09 (Allen, J., dissenting). Other pieces of evidence, meanwhile, are comparatively unlikely to hit this small bullseye of relevance and reasonableness, for they are not "in the same league" as the NAS reports. *Davis*, 36 Vet.App. at 156 (Falvey, J., concurring). Indeed, the upshot of *Davis* was that four such documents missed the mark. *Id.* at 150-55 (majority opinion) (finding that a memo, certain letters and affidavits, and a brief could not be constructively possessed as evidence).

Although factfinding is the Board's bailiwick, there is no more for the Board to decide on the issue of constructive possession, at least regarding NAS reports. *See Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1105-06 (9th Cir. 2014). All that is left is to apply the rule as it has essentially been after *Euzebio*—that the Agency is held to constructively possess NAS reports—and consider the updates. We emphasize that we are not holding that the two reports will provide enough evidence to demand a medical exam, just that the Board needed to consider them during its discussion about the issue.

The only thing that delivers us a fleeting moment of pause is that this case concerns constructive possession at the AOJ level whereas the caselaw we cited concerned the Board. These precedents, however, extended constructive possession to these circumstances by describing "VA generally" and "VA adjudicators" as aware of the NAS reports and their contents. *See Euzebio*, 989 F.3d at 1320, 1325 n. 11; *Davis*, 36 Vet.App. at 156-57. In deciding that NAS reports published before an evidentiary closing are always constructively possessed by the AOJ and the Board, then, we are merely making that reasoning explicit and controlling.

## IV. A SCRUTABLE STATEMENT

Constructive possession's redemption arc, however, does not encompass the entirety of Mr. Edwards's appellate argument. Next on our agenda is Mr. Edwards repeated argument that, for multiple reasons unrelated to the doctrine, the Board bungled how it considered whether he was owed an exam. Appellant's Br. at 6-13. Particularly, he takes issue with the Board's treatment of the two unrelated Board decisions he had submitted to the AOJ as evidence. R. at 2613, 2620. In denying the need for a VA exam, the Board reasoned that the decisions "were too general to

24

indicate that there may be a nexus to service" and that an analogy to this case was unwarranted because Mr. Edwards, unlike the claimants in those unrelated documents, did not submit a private medical opinion for the Agency to review. R. at 6, 9. In the end, the Board thought the two decisions were not applicable to this appeal. R. at 6, 8-9.

It is the Board's treatment of these two decisions and, more specifically, the information contained in those decisions that requires our attention. True, we are already remanding this matter so that the Board can consider whether VA fulfilled its duty to assist with the understanding that the NAS reports are constructively before VA. But doing that without clarifying for the Board that it can also consider information from those Board decisions risks prompting a "ping pong game" of remands. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); *Witkowski*, 38 Vet.App. at 471 (declining to leave a regulation's meaning in a "nihilistic ethos" following our decision in a related argument); *Quirin v. Shinseki*, 22 Vet.App. 390, 395-96 (2009). We thus disentangle the remaining dispute concerning which pieces of evidence the Board may or must consider when deciding whether VA owed Mr. Edwards an exam.

### A. Administrative Axioms

It is a foundational principle in our jurisprudence that the Board must provide an adequate statement of reasons or bases for its decisions. *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990). To perform the obligation, it analyzes the credibility and value of evidence, accounts for evidence's persuasiveness or lack thereof, and articulates reasons for rejecting material evidence favorable to the veteran. *Arline v. McDonough*, 34 Vet.App. 238, 247 (2021). The resulting product should be understandable to the veteran and the Court. *Gilbert*, 1 Vet.App. at 57. Although we recently revisited the caselaw and rationale behind the reasons-or-bases requirement, *Medlin v. Collins*, 39 Vet.App. 159, 168-69 (2026), a robust outline of the requirement here would not be amiss, given Mr. Edwards's arguments.

Administrative law serves as the focus of this discussion. Our scope of review is, after all, "similar to that of an Article III court reviewing agency action under the Administrative Procedure Act" (APA), and our jurisprudence regularly borrows from that statute and its attendant principles. *Henderson v. Shinseki*, 562 U.S. 428, 432 n.2 (2011); *see Gilbert*, 1 Vet.App. at 56.

Even before Congress created this Court, the need for a clear statement for agency decision-making has been an embedded feature of federal administrative law.[15] The APA required agency

---

[15] Indeed, the Supreme Court has recognized that the "administrative process will best be vindicated by clarity

decisions to include a statement of "findings and conclusions, as well as the reasons and bases therefor" when it was passed in 1946, and that command lives on in the U.S. Code today. *See* 60 Stat. 237; 5 U.S.C § 557(C). By enacting nearly identical language in the VA appeals context, *see* 38 U.S.C. § 7104(d) (directing Board decisions to "include a written statement of the Board's findings and conclusions, and the reasons or bases for those findings and conclusions."), Congress intended the two provisions to communicate the same thing, *see Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 6 (2018) (giving a repeated term in the U.S. Code the same meaning).

Restating this bedrock command to include the need for a scrutable statement, the Supreme Court wrote that the basis for an agency decision "must be set forth with such clarity as to be understandable." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Reviewing courts, it emphasized, should not be "compelled to guess at the theory underlying the agency action" or be expected to discern precision from "what the agency has left vague and indecisive." *Id*. at 197. If an administrative decision, therefore, presents "no findings and no analysis to justify the choice made," the issuing agency committed error under the reasons or bases requirement. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1967). Our seminal decision in *Gilbert* mirrored this reasoning, holding that Board decisions must "contain clear analysis and succinct but complete explanations." 1 Vet.App. at 57.

But "[i]t is always possible to quibble with an agency's explanation; a motivated litigant will be able to identify parts of any agency explanation that could have been more precise or thorough." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023). To account for such quibbling, courts require agencies to show their work but do not require an A+ effort. *McClain v. Nicholson*, 21 Vet.App. 319, 321 (2007). Absent clear error, even a skeletal and rudimentary rationale may satisfy the requirement so long as the agency explains the material facets of its disposition. In other words, courts will generally "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, Inc., 419 U.S. 281, 286 (1974); *see Minneapolis & St. L. Ry. Co. v. United States*, 361 U.S. 173, 193 (1959). But courts are unable to "require agencies to engage in procedures" beyond those required by statute or the Constitution. Sidney A. Shapiro & Richard E. Levy, *Heightened Scrutiny in the Fourth Branch*, 1987 DUKE L.J. 387, 435 (1987) (citing *Vermont Yankee Nuclear Power*

---

in its exercise" and that agency decisions should "disclose the basis of [their] orders" prior to the passage of the APA itself. *See Phelps Dodge Co. v. NLRB*, 313 U.S. 177, 197 (1941).

*Co. v. NRDC*, 435 U.S. 519, 546 (1978); *see Medlin*, 39 Vet.App. at 169-70 (refusing to thrust additional duties on VA).

Circuit courts likewise described an agency's statutory obligation to extend only so far as to alert reviewing courts of the grounds for its material findings and conclusion. *See, e.g.*, *Ojo v. Garland*, 25 F.4th 152, 160 (2d Cir. 2022); *Friedman v. FAA*, 890 F.3d 1092, 1097 (D.C. Cir. 2018). Even if one eschews the parallels between a general concept of reasons and bases review and our practice, remember that the Federal Circuit demands the same level of clarity from VA in cases on appeal from this Court. *See Snyder v. McDonough*, 1 F.4th 996, 1006 (Fed. Cir. 2021) (explaining that an agency's reasoning need only be discernible to satisfy the reasons or bases requirement)).

In limning the foundations of our reasons or bases requirement, we do not depart from past caselaw. We instead reinforce the idea that the adequacy of a Board statement revolves around its coherency. *See Gilbert*, 1 Vet.App. at 57. There are many reasons why a Board's statement could fail this standard, but a statement is not automatically incomprehensible whenever it leaves out particular non-material evidence or loquacious validations. Rather, the Board's obligation of explanation is satisfied if we can understand what it decided on all material issues of fact and law and why it did so. *See Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799, 803 (4th Cir. 1998).

### B. Confusing Contentions

This synopsis comes in handy as we return to the Board decision in Mr. Edwards's case. At the outset, we note that Mr. Edwards seemingly conflates the reasons or bases requirement with his substantive concerns about the decision's reasoning. *See* Appellant's Br. at 7-13; OA at 6:45-9:15. But because the reasons or bases requirement is exclusively interested in explanatory errors, we only concern ourselves with those contentions that the decision is nonreviewable. *See Bowman Transp.*, 419 U.S. at 285-86; *Gilbert*, 1 Vet.App. at 56-57. From his briefing, we discern three contentions of this ilk, each more confounding than the last.

The first of these asserts that the Board's decision omitted a rationale regarding its finding that the two unrelated Board decisions were insufficient to reflect the possibility of a nexus in his case. Appellant's Br. at 11. Horsefeathers! Over a page of the succinct decision was dedicated to this very topic. To refresh our readership, the Board said that its unrelated dispositions constitute evidence only insofar as they match the case, and the two 2015 decisions Mr. Edwards presented

27

were "too general and conclusory" to be analogous or indicate a nexus between herbicide exposure and squamous cell carcinoma. R. at 6, 8.

The Board did not stop there but dedicated two paragraphs to parsing the details of each decision "in terms of their applicability" to Mr. Edwards's claim. R. at 8. The decision from April 2015, it explained, had demonstrated an indication of an association between exposure and service through a private medical exam, and Mr. Edwards had submitted no such exam that could bolster his claim. *Id*. The September 2015 decision, the Board explained, showed the possibility of a nexus between either sunlight or herbicide exposure, also through a private medical opinion. R. at 9. And Mr. Edwards neither submitted a private opinion nor reasonably raised the theory of sunlight exposure as the cause his carcinoma. *Id*. The Board therefore concluded that neither of the cited decisions applied to Mr. Edwards's individual circumstances, even if they granted service connection for the same disability. *Id*.

We readily understand the reason for the Board's distinguishments: the unrelated decisions were too general, conclusory, and unanalogous to reflect an actionable indication of a nexus in his case. Indeed, the pathway of the Board's rationale could be made more discernible only by adding superfluous lexical guardrails to its decision. *See Bowman Transp.*, 419 U.S. at 286; *McClain*, 21 Vet.App. at 321. Mr. Edwards, moreover, also appears to comprehend the Board's reasoning. *See Gilbert*, 1 Vet.App. at 57. He could hardly argue, as he does later, that the decision wrongly applied the law if he could not first articulate how and why the Board applied the law the way it did. *See Burlington*, 371 U.S. at 167. And because the Court and Mr. Edwards understand why the Board decided that its unrelated 2015 decisions did not aid the claim, granting a remand based on the need for clarification would be inappropriate. *See Arline*, 34 Vet.App. at 247; *Gilbert*, 1 Vet.App. at 57.

The second reasons or bases argument Mr. Edwards attempts would have the Board discuss why VA furnished exams for the veterans in the unrelated decisions but not for him. Appellant's Br. at 11. We are unsure why Mr. Edwards thought this an argument worth making. As we see it, this is one of those unhelpful contentions that merely identifies parts of the Board's decision that "could have been more precise or thorough." *See Earth Island*, 82 F.4th at 637. As we explained, the Board need not undergo an exhaustive compare-and-contrast exercise with its past decisions to satisfy its statutory obligations. *See Bowman Transp.*, 419 U.S. at 286. Its decision, after all, is

28

not made inscrutable because it distinguished the 2015 decisions just enough to find that they did not apply to this case.

This assertion similarly lands far from the tree of relevance. *See Arline*, 34 Vet.App. at 247 (requiring the Board to consider only material evidence potentially favorable to the claimant). Not only did Mr. Edwards fail to make this comparison to the Board, *see* R. at 19-20, but nothing in either unrelated 2015 decision explains why VA furnished the exams mentioned therein, *see* R. at 2613, 2620. *See Robinson v. Peake*, 21 Vet.App. 545, 553 (2008) (holding that the Board must discuss theories made by the claimant and theories reasonably raised by the record), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). If the Board could not tell why VA provided the 2015 veterans with an exam, in other words, it could not opine on whether an exam here would be warranted on the same grounds or whether the cases are analogous.

Third and finally, Mr. Edwards complains that the Board failed to explain what information besides a private opinion may show an indication of a nexus between his herbicide exposure and disability. Appellant's Br. at 12-13. This assertion again misunderstands the point of the reasons or bases requirement. Contrary to Mr. Edwards's beliefs, the Board is not compelled to discuss the evidence it would or might find sufficient after rejecting evidence it did not find sufficient. Rather, its duty under section 7104(d) is limited to formulating findings on material issues and presenting those findings intelligibly. *See Arline*, 34 Vet.App. at 247. Because it would be an ultracrepidarian exercise to inject additional burdens into the Board's explanatory obligation, we refuse to dragoon the Board into explaining which evidence might have produced a favorable result. *See Vermont Yankee*, 435 U.S. at 546; *Medlin*, 39 Vet.App. at 169.

Just because a decision is reviewable does not make it right, and just because a decision is wrong does not make it incomprehensible. The Board's reasons or bases requirement, as we have labored to clarify, covers only the reviewability half of the analysis. Although Mr. Edwards made *some* unadulterated reasons or bases arguments, their collective constitution was weak; the Board's decision in his case confronted the correct issues and transcribed its justifications in a reviewable manner. *See Arline*, 34 Vet.App. at 247; *Gilbert*, 1 Vet.App. at 57. The bulwark of Mr. Edwards's residual arguments, which we next consider, instead lie entwined with the decision's legal merit.

29

**V. DIVORCED DOCUMENTATION**

Recall that Mr. Edwards argued that the Secretary needed to provide him with an exam based on evidence contained within the NAS reports and the unrelated Board decisions. So far, we have found that the Board should have considered the reports when determining the need for an exam. We now turn our eyes to the second half of Mr. Edwards's question: whether and to what extent the Board must consider unrelated Board decisions in that same analysis. But before we can dive into that discussion, we must discern whether Mr. Edwards's own advocacy prevents us from reaching the issue.

*A. Satisficing Sentiments*

Mr. Edwards's briefing almost asserts that the Board did not correctly apply *McLendon v. Nicholson*, 20 Vet.App. 79 (2006), in light of the NAS reports and unrelated Board decisions. *See* Appellant's Br. at 6-9 ("The other Board decisions demonstrate the medical plausibility [of an indication of a nexus] and therefore appear to meet [*McLendon*'s] low threshold."). However, the thrust of his argument section relied on our caselaw describing reasons or bases remands. *Id.*

When we sought to clarify the argument, Mr. Edwards stumbled into a quagmire. He alleges that the Board's application of *McLendon* was incorrect and prevented all relevant evidence from being heard, but he then disavowed the exercise of our standard of review related to legal errors. OA at 6:45-9:15, 14:00-14:20. Mr. Edwards thus styled his remaining arguments as primarily related to the reasons or bases requirement when he targeted the soundness of the Board's legal applications. *See* Appellant's Br. at 7-13; OA at 6:45-9:15. But after careful consideration of these arguments, we think that he said barely enough for us to consider the merits of the Board's discernible reasoning. *See Margolin v. NAIJ*, 608 U.S. ___, 146 S. Ct. 1285, 1288 (2026) (reversing a decision since the lower court resolved the appeal based on an argument not decided below).

In our adversarial system, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). This jurisprudential hallmark preserves twin aims. It first protects litigants' autonomy to fairly present their case. *See* STEPHAN LANDSMAN, READINGS ON ADVERSARIAL JUSTICE 33-39 (1988). In so doing, it helps the reviewing court by narrowing the issues and allowing for focused argument. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[I]t gives the appellate court the benefit of written arguments and provides the court and the parties with an

opportunity to prepare for oral argument with the opposing positions and arguments in mind."). The opposition also benefits by being provided with the chance to meaningfully respond to the arguments. *See* Allan D. Vestal, *Sua Sponte Consideration in Appellate Review*, 27 FORDHAM L. REV. 477, 493 (1958).

The party presentation rule also bolsters the independent role of the judge. *See* LANDSMAN, at 34 ("When litigants direct the proceedings, there is little opportunity for the judge to pursue her own agenda or to act on her biases."). Thus, the greater the room is for judicial discretion, the greater the chance is for judges to turn to personal preference. *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021) (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1180 (1989)). In short, because courts are "'passive instruments of government'," it is far beyond their role to "'sally forth each day, looking [past the briefing] for wrongs to right'." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)).

This is "quite a wind-up," *United States v. Campbell*, 26 F.4th 860, 899 (11th Cir. 2022) (Newsom, J., dissenting), but it is helpful when describing why the parties' arguments here permit us to judge passively, as the adversarial system intends. First, Mr. Edwards's briefing tells both parties where to look—at the two unrelated Board decisions and NAS reports—and what to look for—a legal error in its *McLendon* application. *See* Appellant's Br. at 6-9. The Secretary's briefing, in turn, substantively defended the Board's examination of the decisions and *McLendon* analysis, even articulating the "arbitrary and capricious" standard of review we adhere to while correcting legal error. Secretary's Br. at 7, 11-12. The litigants, we think, sufficiently and equally exchanged their partisan positions.

Second, this case does not find us on an expeditionary journey through the Board's decision to right any potential wrongs we might come across. *See Sineneng-Smith*, 590 U.S. at 376. We know why Mr. Edwards substantively disagrees with the Board: he believes that it misapplied *McLendon*. With the Board's application of *McLendon* opaquely, but unmistakably, pictured before us, we have little room to deviate from the related argument.

Addressing this legal issue indeed seems to further our role in the adversary process. We may not advocate or search for arguments in favor of one party, but our independence does not "demand judicial passivity in the face of litigants' mischaracterization of legal standards." Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J. 447, 517 (2009). Just because Mr. Edwards fails to

31

"fully and accurately describe the meaning of legal standards" that he wants applied does not relieve us of our duty to say what the law is. *Id*.; *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

The rule of party presentation remains essential to the administration of this Court. There will be instances where a party's failure to raise a theory consigns that theory to oblivion. *See, e.g.*, *Carbino v. Gober*, 10 Vet.App. 507, 511 (1997) (declining to review a new argument raised in a reply brief), *aff'd sub nom. Carbino v. West*, 168 F.3d 32, 34 (Fed. Cir. 1999). Such an action, however, is unwarranted for a veteran's attribution of an incorrect legal standard to an otherwise assayable argument.[16] Because the background principles supporting the party presentation rule would not be compromised by attending to Mr. Edwards's substantive issue, we next scrutinize the legal validity of the Board's *McLendon* analysis.

### B. Embedded Indications

As part of his duty to assist obligations listed under 38 U.S.C. § 5103A, the Secretary must provide certain claimants with a medical exam or opinion. *See Paralyzed Veterans of Am. v. Sec'y of Veterans Aff.*, 345 F.3d 1334, 1355 (Fed. Cir. 2003); 38 C.F.R. § 3.159(c)(4)(i) (2026). To trigger this requirement, there must be (1) evidence of a veteran's current disability or symptoms thereof; (2) evidence of an in-service event, injury, or disease; (3) an indication that the disability or symptoms are linked to military service or a service-connected disability; and yet (4) not enough competent medical evidence for the Secretary to decide the claim. § 5103A(d). This mandatory collection of evidentiary tells is often referred to as the *McLendon* test, as we explicated the duty to provide an exam in that case. 20 Vet.App. at 81-86; *see Healy v. McDonough*, 33 Vet.App. 312, 325 n.11 (2021) (Meredith, J., concurring).

While Mr. Edwards assails the Board's finding that the evidence stops shy of satisfying the *McLendon* analysis, the Secretary avouches that finding. Secretary's Br. at 7-14. The determination in question, that the evidence shows no indication that Mr. Edwards's squamous cell carcinoma may be associated in any way with his service, concerns only the third element of the test. R. at 6; *see McLendon*, 20 Vet.App. at 81. Our audit of the application, which employs the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of review

---

[16] That said, we expect that our clarification of the reasons or bases requirement above will prevent similar confusion in the future.

when reviewing the Board's decision not to give an exam, is accordingly limited to that third element. *See McLendon*, 20 Vet.App. at 81, 83.

An indication of an association is distinct from the familiar search for "medical evidence of a nexus" between current disability and service. *Compare id*. *with Washington*, 19 Vet.App. at 367 (listing the requirements for direct service connection). Indeed, the third *McLendon* element sets a threshold that is "lower than that required for the ultimate determination whether a veteran's disability is related to his or her service." *Ray v. Wilkie*, 31 Vet.App. 58, 66 (2019); *see McLendon*, 20 Vet.App. at 83-84. Albeit with guidance, Mr. Edwards asserts that the Board's analysis applied a standard higher than that prescribed when it determined that the unrelated decisions could not substantiate the "indication" element in his claim. *See* Appellant's Br. at 9-10. He is correct.

The nucleus of our discussion morphs, therefore, into determining what information could "show some causal connection between his disability and his military service." *Wells v. Principi*, 326 F.3d 1381, 1384 (Fed. Cir. 2003). It is not an unfamiliar query. *McLendon* explained that "medical evidence that suggests a nexus but is too equivocal or lacking in specificity to support a decision on the merits, or credible evidence of continuity of symptomatology such as pain or other symptoms capable of lay observation" may adduce the sought-after indication. 20 Vet.App. at 81. As low as *McLendon*'s threshold is, however, a veteran's "conclusory generalized statement" alleging indications sets too low a floor. *Waters v. Shinseki*, 601 F.3d 1274, 1278 (Fed. Cir. 2010) (reasoning that embracing these statements would eliminate "carefully drafted statutory standards governing the provision of medical examinations," and thus require exams to be given in all cases).

Unlike cases past, the evidence at issue here arrives from facts extrinsic to Mr. Edwards's experiences. In other words, the evidence supposedly supporting an indication of a nexus lies not within Mr. Edwards's history, but within Board decisions, private medical exams, and allegations related to the cases of different veterans. "Because the circumstances surrounding another veteran's Agent Orange claim for squamous cell carcinoma resulted in a medical exam," Mr. Edwards seems to say, "so should mine." But that position conflicts with the regulatory authority cited by the Board in its decision.

Reflecting the application of horizontal precedent in the courts, 38 C.F.R. § 20.1303 states that previous Board decisions "will only be considered binding only with regard to the specific case decided." *Cf. Cohen v. Perales*, 416 F.2d 1250, 1251 (5th Cir. 1969) ("However, each case is different from the next one and must be tried and decided on its particular facts and according to

33

law."). Yet those decisions may yet be consulted as optional, persuasive authorities "to the extent that they reasonably relate to the case" then being adjudicated. § 20.1303; *cf.* Frederick Schauer, *Authority and Authorities*, 94 VA. L. REV. 1931, 1946-47 (2008). Just as we are free to disregard the substance of nonprecedential cases, *see Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992), the Board is free to disregard its unrelated decisions unless it finds them instructive.

Thus, unrelated Board decisions, standing alone, are insufficient to satisfy the "indication" factor in the *McLendon* analysis unless the Board determines that the decisions are appropriately analogous. To decide otherwise would be to cut against § 20.1303 and the permission given to the Board to disregard decisions divorced from the facts of the case before it. The idea that Veteran *X* should be furnished with an exam because Veteran *Y* was furnished with an exam in a different decision resolves the *McLendon* issue based on the peculiarities of Veteran *Y*'s record, not Veteran *X*'s record. And that finding could hardly be consistent with the regulation's command to the Board to adjudge matters "on the basis of the individual facts of the case." § 20.1303.

A contrary rule engorges the various sources that could provide a *McLendon*-satisfying indication. Like the Federal Circuit reasoned in *Waters*, the theory that a veteran could fulfill the third *McLendon* prong by submitting any Board decision in which a veteran underwent a VA exam for the given disability "would eliminate the carefully drafted statutory standards . . . and require the Secretary to provide such examinations as a matter of course." *Waters*, 601 F.3d at 1278. We think it doubtful that Congress intended such a result when delineating circumstances under which VA must provide an exam, especially given the longstanding nonprecedential nature of Board decisions. *Id*.

Just because essential facts and holdings of unrelated Board decisions cannot be considered without a finding of similarity, however, does not mean that evidence referenced within such a decision cannot be considered. In other words, the reasoning and facts in an unrelated decision might not apply to Mr. Edwards's case, but the evidence the Board considered in an earlier decision might. The regulation, moreover, does not purport to prohibit the Board's consideration of evidence cited through another decision or document.

To illustrate our point, harken back to the April 2015 decision that included the embedded citation of *Update 2010* and its theories. In that decision, the Board restated the findings and rationale of the private medical examiner who examined the unknown claimant. R. at 2615. Though the unrelated decision recounted various, faceless medical studies the examiner relied on

34

when providing his opinion, it identified one report by name: the *Update 2010* NAS report. *Id*.[17] The Board's prior decision spelled out the theory discussed above, through which the report found "a reasonable mechanistic hypothesis for an excess of cancers in Vietnam-era veterans exposed to Agent Orange." *Id*. And we know that the Board decision at issue here looked at that discussion, for its reading of the April 2015 decision was not lacking in detail as the Board explicated its distinction from Mr. Edwards's case. R. at 8.

Of course, we have held that *Update 2010* was constructively before the AOJ and should have been considered as part of the Board's *McLendon* analysis. But, as we see things, mention of this report exemplifies the type of information the Board may account for, even if it arrives via an unrelated decision. This is because references and summaries like those in the April 2015 decision comply with the strictures of both § 20.1303 and section 5103A(d). Unlike the findings and notabilia assembled within the Board's unrelated discussion, the pronouncements communicated through *Update 2010* are not intended or even believed to cater to a singular claimant. *See* NAT'L ACAD. OF SCI., UPDATE 2010, at 15 (relaying that the report did not consider facts of "specific cases in which individual Vietnam veterans have claimed injury from herbicide exposure"). Rather, the discussion assists the Secretary by outlining whether certain conditions in *all* veterans are associated with herbicide exposure. *See id*. at 17-22; Agent Orange Act, 105 Stat. at 11; *Nehmer*, 712 F. Supp. at 1409. Its reported findings, therefore, could be viewed as an indication that a given disability was the result of a given exposure. *See McLendon*, 20 Vet.App. at 83-85.

The fact that *Update 2010* was mentioned within the pages of an unrelated Board decision, in other words, is irrelevant. In fact, we view these facts as effectively identical to a hypothetical scenario in which Mr. Edwards gave a document to the AOJ summarizing the report. Under those circumstances, VA would almost certainly consider that evidence, and we discern no reason why that should change because the summary happened to also include the unreviewable features of a Board decision.[18] Because the unrelated decision explicitly identified the report and the way it applied to cases concerning squamous cell carcinoma, Mr. Edwards's submittal of the April 2015

---

[17] As a reminder, mere citation or mention of studies does not bring them into the record. *See Bowey*, 11 Vet.App. at 109,

[18] Or imagine an unrelated Board decision with a relevant portion from a medical treatise appended thereto. We cannot see a reason why the regulation would not permit a future Board from considering the appended pages if they were properly submitted to the AOJ. The fact that an unrelated decision preceded the pages is irrelevant to the content of the excerpt.

decision had the same effect of telling VA about *Update 2010* and its theories. And it does so without resistance from § 20.1303, since the NAS reports are not made in connection with the unrelated veteran's claim but made with claims like Mr. Edwards's in mind.[19]

This all unearths a legal error in the Board decision we review here. By ignoring the citation and discussion made within the April 2015 decision, the Board misapplied § 20.1303. We wish to avoid a similar error on remand. Thus, we hold that the regulation does not categorically prevent VA from considering information embedded in an earlier, unrelated decision, When faced with such evidence, the Board must discover whether the unrelated decision contains independent and generally applicable information—such as the summary of an NAS report—that may be useful to deciding the question on appeal.

Here, the Board's implicit discounting of the April 2015 decision's discussion renders its reasoning not in accordance with law. *See Moody v. Wilkie*, 30 Vet.App. 329, 340 (2018). Remand is thus warranted to determine whether anything in the other Board decisions may be considered alongside the constructively possessed NAS reports when determining if Mr. Edwards is entitled to a VA exam.[20] *See Tucker*, 11 Vet.App. at 374.

## VI. DISCIPLINED DECISIONMAKING

Though Mr. Edwards levies a final charge against the Board's decision, venturing far into its merits would be unnecessary. We will, however, grant the argument an obligatory salute. Mr. Edwards's contention is that the Board failed to honor 38 U.S.C. § 1168(a) while finding that he did not require a VA exam. Appellant's Br. at 15-17. Under that provision, the Secretary must furnish an exam when a claimant (1) has evidence of a present disability; (2) has participated in a toxic risk activity; and (3) cannot yet establish service connection. § 1168(a).

A favorable disposition regarding this assertion would result in a remand from the Court, requiring the Board to reexamine its finding that a VA exam was unwarranted, this time accounting for section 1168(a). *See Tucker*, 11 Vet.App. at 374. Because we are already remanding the claim

---

[19] To be sure, we offer no decision as to whether a mere mention of an NAS report would bring it into the record or trigger VA's duty to assist. In *Bowey,* 11 Vet.App. at 106, we decided that a study cited on a document submitted to VA does not become part of the record. But whether the Board must go out and get a document that is sufficiently identified in a Board decision or another document is a matter for another case.

[20] We cannot opine on whether the references to *Update 2010* are sufficient to trigger the Secretary's duty to assist; the Board must take a closer look at the unrelated decisions and determine whether their contents satisfy the third *McLendon* element.

36

so that the Board may correct a past legal error on the same subject, further consideration of this correspondent issue would not conclude with a greater remedy than the one provided. *See Best*, 18 Vet.App. at 20. And such consideration would be unrestrained; we choose to "observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case." *See Whitehouse v. Illinois Central R. Co.*, 349 U.S. 366, 372–373 (1955).

## VII. CONCLUSION

When it comes to constructive possession and *McLendon*, some types of evidence are more equal than others. *Euzebio*, 31 Vet.App. at 408 (Allen, J., dissenting) (citing GEROGE ORWELL, ANIMAL FARM 112 (1945)). When Congress passed the Agent Orange Act, it anticipated that VA would be aware of the findings made in the resultant NAS reports. Nothing in the AMA suggests otherwise.

Without a statutory instruction that constructive possession ceases to apply in the modern system, controlling caselaw compels us to hold that NAS reports existing at the time of an initial decision would be included in the record of Agent Orange cases. Further, independent evidence cited and explained in an unrelated decision may not be categorically excluded simply because it comes by way of a Board decision. In this case, the Board misapplied the law by failing to review *Update 2010* and *Update 2012*, as well as any independent evidence that was reasonably communicated through the unrelated 2015 decisions, in its *McLendon* analysis.

\* \* \*

For these reasons, the August 5, 2024, Board decision denying service connection for squamous cell carcinoma is VACATED and the matter is REMANDED for further adjudication consistent with this opinion.

JAQUITH, *Judge*, concurring: I wholeheartedly agree that the Board's failure to review NAS *Update 2010* and *Update 2012*, as well as the Board's failure to consider information in the unrelated April 2015 and September 2015 decisions the veteran highlighted, require the Board decision denying service connection for squamous cell carcinoma to be vacated and this matter remanded for further adjudication. I write separately to express my different perspectives regarding

37

the Court's assessment of the origins of the constructive possession doctrine and the propriety of the Court's consideration of the veteran's arguments.

## A. *Constructive Possession*

The first challenge to the majority opinion's alignment arises in its critique of the Court's decision in *Bell v. Derwinski*, 2 Vet.App. 611 (1992). In my view, the majority's initial criticism of *Bell* as a "poor interpretive exercise" that, at best, created a rule using disfavored common law powers, *ante* at 8 n.7, is misplaced. Instead, *Bell* interpreted the meaning of "the record of proceedings before the Secretary and the Board" on which the Court is to provide independent judicial review, 38 U.S.C. § 7252, in the manner of the Supreme Court's holding over three decades later that "courts must exercise independent judgment in determining the meaning of statutory provisions," including the statute's single, best reading. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). It is true that *Bell* is a two-page per curiam opinion without frills, but its holding is sensible and unmistakable: Three documents generated by VA concerning the veteran's death and the ensuing claim by the appellant, plus the statement the appellant submitted to VA as part of her claim, all predating the Board decision, were, under section 7252(b), "'before the Secretary and the Board' when the [Board] decision was made" as documents "within the Secretary's control [that] could reasonably be expected to be a part of the record"—even though VA couldn't find them. *Bell*, 2 Vet.App. at 613.

All is well when the majority moves past its initial skepticism and finds *Bell'*s view of constructive possession rooted in "historic and settled legal precepts" rooted in British soil. *Ante* at 9-10. Ultimately, NAS Updates are constructive possession royalty—existing "by congressional mandate, to give the VA necessary 'independent scientific review of the available scientific evidence regarding associations between diseases and exposure to dioxin and other chemical compounds in herbicides[.]'" *Euzebio v. McDonough*, 989 F.3d 1305, 1320 (Fed. Cir. 2021) (quoting the Agent Orange Act, Pub. L. No. 102–4, 105 Stat. 11 (1991) (codified in part at 38 U.S.C. § 1116)). *Euzebio* highlighted that "[t]he importance and relevance of the NAS Reports to Agent Orange claims are well-known and well-established." *Euzebio*, 989 F.3d at 1320.

The updates begin by saying that they are supported by a contract between VA and the National Academy of Sciences—so VA had the 2010 and 2012 updates during the evidentiary record window for Mr. Edwards's claim. Not only did VA pay to have studies done, the covers of the study reports say "[k]nowing is not enough; we must apply," quoting famed scientist Johann

38

Goethe. Yet VA knew and possessed but would not apply the study results unless the veteran printed out and sent in the 806-page 2010 update and the 986-page 2012 update. R. at 9 (noting that the veteran "contended that there are 'past VA-commissioned Agent Orange Commission reports of a possible association between exposure to Agent Orange and susceptibility to squamous cell carcinoma in veterans who served in Vietnam' . . . but did not submit them for the record"). Allowing the Board to deny benefits by ignoring studies it knows contain important information, actually and constructively possesses, and has read and applied "can't possibly be the outcome of a rational system of adjudication, especially one designed to be pro-veteran and nonadversarial." *Euzebio v. Wilkie*, 31 Vet.App. 394, 409 (2019) (Allen, J., dissenting), *vacated and remanded sub nom. Euzebio v. McDonough*, 989 F.3d 1305 (Fed. Cir. 2021). As the Court concludes, VA possesses *Update* 2010 and *Update* 2012 and must apply them in considering the veteran's case.

## B. *Reasons or Bases*

A second issue developed from the insistence by the veteran's counsel, in briefing and at oral argument, that the Board's determinative error was its failure to state adequate reasons or bases for its decision. I fear that some of the Court's commentary regarding the veteran's appeal could do lasting damage to our efforts to fulfill the Court's obligation to provide independent judicial review. *See Am. Legion v. Nicholson*, 21 Vet.App. 1, 3 (2007) ("Congress established this Court under Article I of the U.S. Constitution to provide our nation's veterans and their families with independent judicial review of Board decisions.").

We seem to agree that a proper appeal starts with identifying the issue(s) being appealed, *see* U.S. VET. APP. R. 28, because:

> The requirement that issues be raised in a party's brief on appeal promotes careful and correct decision making. It ensures that the opposing party has an opportunity to reflect upon and respond in writing to the arguments that his [or her] adversary is raising. And it gives the appellate court the benefit of written arguments and provides the court and the parties with an opportunity to prepare for oral argument with the opposing positions and arguments in mind. It is not too much to ask of an appellant or an appellee.

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). *See ante* at 30-31.

The veteran argued that the Board provided inadequate reasons or bases for finding VA had no duty to obtain an examination pursuant to *McLendon v. Nicholson*, 20 Vet.App. 79 (2006), in that the Board applied too high a standard in assessing the third *McLendon* element when it

39

rejected the probative value of other Board decisions, the Board erred in finding that the NAS Update 2012 was not received prior to the AOJ's rating decision and not considered, and the Board erred in failing to address whether remand was warranted to provide a VA medical examination or opinion under 38 U.S.C. § 1168. Appellant's Brief at 5-6. The appellant requested that the Board decision be vacated in light of the Board's errors and the matter remanded for readjudication.

The Secretary argued for affirmance of the Board's denial of service connection, contended that neither Update 2010 nor Update 2012 was before the Board, and noted that appellant sought review of the Board's finding that the evidence did not indicate that his squamous cell carcinoma may be associated with service but did not argue that the Board's finding was arbitrary or capricious, only that the Board provided an inadequate statement of reasons or bases for its finding.

At oral argument, the veteran's counsel again characterized the arguments as challenging the Board's reasons or bases but acknowledged that the *McLendon* issues were substantive, without addressing the standard of review. Even so, giving the veteran's pleading a liberal construction, *see Scott v. McDonald*, 789 F.3d 1375, 1381 (Fed. Cir. 2015), I agree with the majority that the veteran adequately challenged the merits of the Board's decision.

### C. *Adversarial Justice*

As the Court recognizes, appellate judges serve as neutral arbiters. *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see ante* at 30. But neutral does not mean inert. As *Greenlaw* notes, Federal Rule of Criminal Procedure 52(b) provides that "'[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention.'" *Greenlaw*, 554 U.S. at 247 (quoting FED. R. CIV. P. 52(b)). Federal Rule of Civil Procedure 51(d)(2) similarly provides that "[a] court may consider a plain error in the [jury] instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights." The Supreme Court has held that "[t]he Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 736 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (second alteration in original)). And it is axiomatic that, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991). *See Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990) (deciding the appeal on a

question antecedent to the questions presented, *id.* at 77, although "neither the parties, the interested agencies, nor the Court of Appeals considered the construction of [the statute] that the Court adopts today," *id.* at 86 (Stevens, J., concurring)). In *Forshey v. Principi*, the Federal Circuit cited *Kamen* in holding that "we may decide to apply the correct law even if the parties do not argue it, if an issue is properly before this court." *Forshey v. Principi*, 284 F.3d 1335, 1357 (Fed. Cir. 2002) (en banc). The Federal Circuit added this quotation:

> Appellate review does not consist of supine submission to erroneous legal concepts even though none of the parties declaimed the applicable law below. Our duty is to enunciate the law on the record facts. Neither the parties nor the trial judge, by agreement or passivity, can force us to abdicate our appellate responsibility.

*Id*. at 1357, n. 20 (quoting *Empire Life Ins. Co. of Am. v. Valdak Corp.*, 468 F.2d 330, 334 (5th Cir. 1972)).

Neutrality and fidelity to the law are foundation stones for fulfilling our appellate responsibility.[21] However, the parties are preeminent in picking the forum and presenting their cases, including, at the appellate level, assembling the record and propounding factual and legal arguments—in briefs and often also in open court. In that sense, "[p]arty control over case presentation is a central tenet of the American adversarial legal system." Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J. 447, 449 (2009). The emphasis on party presentation has several benefits, including that it preserves the neutrality of the judge, encourages and enables the advocates and parties to put their best case forward, and promotes attention to the concerns of individuals—which may affect their acceptance of the outcome. *See* Landsman, READINGS ON ADVERSARIAL JUSTICE at 33-36.[22] [23]

"Federal courts adhere to the principle of party presentation." *Margolin v. Nat'l Ass'n of Immig. Judges*, 146 S. Ct. 1285, 1288 (2026). "The party presentation principle is supple, not

---

[21] The American adversarial adjudication system was shaped by appellate courts "committed to a careful search of the record to determine if there was error warranting reversal." Stephan Landsman, READINGS ON ADVERSARIAL JUSTICE: THE AMERICAN APPROACH TO ADJUDICATION 19 (1988).

[22] As Professor Landsman put it, "[a]dversary procedure has served as a guardian of individual liberty since its inception," while "[i]nquisitorial judges . . . are bureaucrats who identify with the government." *Id*. at 39.

[23] Supreme Court Justice Clarence Thomas says "judges should adopt principles of interpretation and methods of analysis that reduce judicial discretion" and maintain impartiality "by tethering their analysis to the understanding of those who drafted and ratified the text [of the U.S. Constitution]." Clarence Thomas, FRANCIS BOYER LECTURE AT THE AEI ANNUAL DINNER: BE NOT AFRAID (Feb. 13, 2001), available at http://www.aei.org/publication/be-not-afraid. *See also* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1180 (1989) ("Only by announcing rules do we hedge ourselves in."). *See Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021).

ironclad" and there are "circumstances in which a modest initiating role for a court is appropriate." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020). "[A] court is not hidebound by the precise arguments of counsel," but "radical transformation" of a case—a court takeover of the appeal—"goes well beyond the pale." *Id.* at 380. Drastic departures from the party presentation principle also resulted in reversal in *Margolin,* 146 S.Ct. at 1288, and *Clark v. Sweeney*, 607 U.S. 7, 9-10 (2025)—by granting relief based on claims the prisoner never asserted without affording the states a chance to address them. Nothing of the sort happened here—inartful briefing and argument do not amount to waiver, especially when the veteran's substantive arguments were readily discernible and discussed in the Secretary's briefing and at oral argument. *See United States v. McReynolds*, 964 F.3d 555, 568 (6th Cir. 2020).

Acceptance of the party presentation principle is widespread, but we nonetheless have rules and a person responsible for their application—a judge who serves as neutral arbiter, because "[t]he judiciary . . . is peculiarly equipped to act as the guardian of fair process." *Moore-McCormack Lines, Inc. v. United States*, 413 F.2d 568, 581 (Ct. Cl. 1969).[24] Neither trials nor appeals are merely parties' parties. As Professor Landsman has written:

> Rules are necessary not only to manage the proceedings but to ensure their fairness. Adversary adjudication is often a zero-sum game. The temptations faced by the parties and their advocates to do whatever it takes to win make essential a rigid set of rules to guard the neutrality of the fact finder and the fairness of the process. These rules must be enforced by the trial judge but will also be scrutinized on appeal to ensure genuine compliance.

Stephan Landsman, *Pro Se Litigation*, 8 ANN. REV. L. & SOC. SCI. 231, 233 (2012).

In reviewing Board decisions, the Court is not limited to choosing between two parties' litigating positions. "[T]he refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary." *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J. concurring). "The job of judges is to decide on the basis of the correct view of the law and not to pick the winner of a debating contest between counsel." Randy E. Barnett & Lawrence B. Solum, *Making the Party Presentation Principle Safe for Originalism*, 174 U. PA. L. REV. 947, 982 (2026). "[T]he legitimacy of the decision rests fundamentally on fidelity to the Constitution and the rule of law."

---

[24] When the Federal Circuit was created in 1982, the judges of the Court of Claims continued in office as judges for the Federal Circuit. Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, § 165, 96 Stat. 25, 50.

43

*Id.* at 981. Here, the parties had "an opportunity for a dialectical exchange on the questions at issue in the case," Frost, 59 DUKE L.J. at 448, and the Secretary addressed the veteran's substantive arguments in briefing, so the Court's consideration of "the merits of the Board's discernible reasoning," *ante* at 30, was proper.